309 Ga. 814
FINAL COPY

S20A1004.  FISHER v. THE STATE.

NAHMIAS, Presiding Justice.

At the second trial of his case, Appellant Ronald Fisher was found guilty of malice murder and related crimes in connection with the shooting death of Derrick Cullins. In this appeal, Appellant contends that the evidence presented at his retrial was insufficient to support his convictions because David Lewis, the only witness to identify him as the shooter, was an accomplice; that the trial court erred by allowing the lead detective to testify that Lewis was not an accomplice; and that his trial counsel provided ineffective assistance by failing to object to the prosecutor's closing argument. As explained below, we affirm.[1]

---

[1] Cullins was killed on May 26, 2009. In June 2010, a Fulton County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. Appellant was originally tried in July 2011, and the jury found him guilty of all counts. In July 2016, however, this Court reversed Appellant's convictions because his trial counsel provided constitutionally ineffective assistance. See

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's second trial showed the following. At around 4:00 a.m. on May 26, 2009, Laura Terrell heard someone banging loudly on the front door of her apartment. Terrell looked out the window of her second-floor bedroom and saw two men standing by her door — one who would later be identified as Cullins, and another who was taller and had a lighter complexion than Cullins. Cullins said, "[W]here Black at? These people want they money, they pills and they ready to take care of business." Terrell replied that she did not know anyone named "Black" and only her children were there. She then heard a gun cocking while the taller man told Cullins, "[Y]ou say you going to get the money, get the money, n**ga." While pretending to retrieve her glasses, Terrell called 911

_Fisher v. State_, 299 Ga. 478 (788 SE2d 757) (2016). In June 2018, Appellant was retried with different counsel, and the jury again found him guilty of all counts. He was sentenced to serve life in prison without parole for malice murder and five consecutive years for the firearm offense. The felony murder count was vacated, and the aggravated assault count merged. Appellant filed a timely motion for a new trial, which he amended in July 2019. After a hearing, the trial court denied the motion in September 2019. Appellant filed a timely notice of appeal, and his case was docketed in this Court to the April 2020 term and submitted for a decision on the briefs.

and got down on the floor. She then heard several gunshots. When she went back to her window, she saw Cullins lying on the ground covered in blood.

Sunsharine Madden, Terrell's neighbor in the adjacent unit, was awakened by the banging on Terrell's door and looked out her window. She saw a man with dreadlocks who was wearing a dark jacket with a white shirt — she later identified him as Lewis — getting out of the driver's seat of a dark-colored sedan. Madden also saw Cullins and a man who was about 5′10″ or 5′11″ tall (which was taller than Cullins), with a low haircut and lighter complexion than Lewis and Cullins, standing at Terrell's door. Madden heard Cullins ask repeatedly for "Black" and to be let into the apartment, and he told the other two men, "Hey, I got this. Why don't you all go around to the back." Madden saw the man with the low haircut walk away on foot while Lewis returned to the car, drove it to another side of the building, and then stayed in the vehicle. Shortly thereafter, the man with the low haircut came back and asked Cullins, "Where my money at? Where the pills?" Madden then saw the man shoot Cullins

at close range. Cullins fell to the ground, and the man stood over him, fired one or two more shots, and said in a Creole or Cajun accent, "[T]hat's what you get for stealing." Madden heard the shooter use the term "woahdie," which she recognized as slang from Louisiana. After the shooting, Madden saw the man go to the car's new location and get into the passenger seat; the car then drove away.

Lewis testified at trial as follows. On the night of the shooting, he was drinking with Appellant at an apartment complex where they both lived. Lewis had dreadlocks and was wearing a black jacket and white shirt. Appellant had a lighter complexion than Lewis; Appellant was from New Orleans, had an accent that sounded like he was from Louisiana, and sometimes used the term "woahdie." Lewis had known Appellant for about six months. Though Lewis and Appellant did not work together, they were both low-level drug dealers in the neighborhood and would sometimes drink and smoke marijuana together.

At some point that night, Cullins, who was a longtime close

friend of Lewis, walked up to Appellant. Appellant gave Cullins some ecstasy pills, and Cullins left. Lewis then drove Appellant in a dark-colored sedan that belonged to Appellant's girlfriend to a nearby gas station to buy some beer. There they again encountered Cullins. Appellant asked Cullins where Appellant's money was, and Cullins said that he had to go get it, leaving on foot. Appellant said to Lewis, "He's taking too long with my money."

Appellant and Lewis returned to their apartment complex and drank the beer before leaving to go to another store. On the way, they passed Cullins walking down the street, and Appellant told Lewis to pull over. Appellant then again asked Cullins for his money. Cullins replied that he had to get the money at a different apartment complex and got into the car, and Lewis drove the three men to the complex.

When they arrived, they all got out of the car. Appellant and Cullins approached one of the apartments while Lewis stood by the driver's side door. Appellant and Cullins knocked loudly on the front door of the apartment, and Cullins then said to a woman inside that

he came to get his money and asked for her boyfriend. She replied: "I'm by myself. Get away from my door." Lewis got back in the car and moved it to the side of the building; he could still clearly see and hear Appellant and Cullins. Appellant said to Cullins, "Give me the money back or the pills." Cullins pulled the pills out of his cap and gave them to Appellant, who put them in his pocket, pulled out a revolver, shot Cullins, and said, "That's what you get for stealing." Appellant then stood over Cullins and shot him twice more before getting in the car and telling Lewis, "That's how we do it in New Orleans."

While still holding the gun, Appellant told Lewis to drive to the apartment of Appellant's friend. Fearing that he would be shot, Lewis complied. When they arrived, Appellant told his friend (who did not testify at trial) that he had shot Cullins. After about 20 to 30 minutes, Appellant and Lewis left. Lewis drove Appellant to Appellant's girlfriend's apartment, where Lewis parked the car and left Appellant around 4:30 a.m. Lewis then located Cullins's family at their apartment, told them that Cullins had been shot, and

accompanied Cullins's brother back to the scene of the shooting.

Lewis testified that at the scene and during a later interview with the police, he initially lied about his involvement because he was afraid that he would be implicated in the shooting, but he changed his mind and told the truth once informed that his friend Cullins had died. Lewis also testified that he did not recall asking Jonathan Clark, an "associate" of Appellant, for Cullins's location any time before the shooting and that he was not even speaking to Clark because of a previous fight. Lewis initially said that Cullins owed him "a couple of dollars" at the time of the shooting, but then said that he had misremembered and denied that Cullins owed him any money. Lewis testified that he did not have access to a car or a gun at the time of the shooting, that he generally did not drive other people's cars, and that in 2008 or early 2009, he had gotten rid of a .38-caliber revolver he owned because it was defective.

A police officer testified that when Lewis and Cullins's brother arrived at the crime scene, the police were there investigating. Madden recognized Lewis and told the officer that Lewis was

present during the shooting. Lewis told the officer that he was just walking past the apartment complex when he saw the shooting and that he attempted to chase down the shooter. Madden then told the officer that she had seen Lewis drive the shooter away from the scene, and the officer placed Lewis in the back of a patrol car so that he could be interviewed later by the lead detective.

Lewis was taken to a police station and questioned by the lead detective. Initially, Lewis continued to deny involvement, but after he was informed that Cullins had died, Lewis admitted that he knew Appellant and Cullins; that he drove them both to the crime scene and witnessed the shooting; and that after the shooting, he drove Appellant to Appellant's friend's house, where Appellant bragged about the shooting, before taking Appellant home. Lewis said that he left the scene after the shooting because he was afraid and in shock after seeing his friend killed. He described Appellant as having a medium complexion, short hair, and a Creole or Cajun accent. Lewis was not arrested, and he was never charged in relation to Cullins's murder. The next day, Lewis identified Appellant from

a photograph as the shooter and took the detective to Appellant's apartment and the apartment of Appellant's friend.[2] Police officers did not locate Appellant until about ten months later in Detroit, Michigan; Appellant tried to flee from the officers but was ultimately arrested and transported back to Georgia.

At trial, the medical examiner who performed Cullins's autopsy testified that his cause of death was a gunshot wound to the chest; he also had gunshot wounds to his face and his back. A firearms examiner testified that the shots were consistent with all being fired from the same revolver, either a .38 special or .357 magnum. The murder weapon was never found.

Appellant's theory of defense was that he was not involved with the shooting and that Lewis was an accomplice of the actual shooter. Appellant did not testify. The only defense witness was Clark, who testified that he knew Appellant, who was from New Orleans. Clark

---

[2] The record shows that the photo Lewis used to identify Appellant was a booking photo from a prior offense. The jury saw a version of the photo showing only Appellant's front profile, his name, and Lewis's signature dated May 27, 2009. The jurors also saw Appellant and Lewis in the courtroom during the trial and saw photos of Cullins in life and from his autopsy.

also knew Lewis, although he had never seen Appellant and Lewis together. Clark claimed that when he learned that Appellant had been arrested, he remembered that he had seen Lewis on a "sunny day hot in the summer" looking for Cullins while driving a white car, in which Clark saw the handle of what he thought was a revolver. He could not remember how long that was before the shooting. Clark also said that Cullins was known in the neighborhood for stealing and not paying back debts, so he assumed (but did not know) that Lewis was looking for Cullins because of a debt.[3]

2. Appellant contends that the evidence presented at his retrial was insufficient to support his convictions because Lewis was an accomplice and was the only witness to identify Appellant as the shooter. We conclude that the evidence was legally sufficient.

(a) Under Georgia statutory law, in felony cases where the only witness is an accomplice to the crimes, the testimony of that witness

---

[3] In evaluating the probative value of Clark's potential testimony in Appellant's previous appeal, we noted that an affidavit provided by Clark said that "he saw Lewis flashing a revolver while looking for [Cullins] to collect on a debt two or three days before the shooting." *Fisher*, 299 Ga. at 484. As indicated, his actual testimony was much less definite.

alone is insufficient to support a defendant's convictions. See OCGA § 24-14-8. When there is "evidence presented at trial [that] could support a finding that a witness acted as an accomplice, it is for the jury to determine whether the witness acted in such a capacity." *Doyle v. State*, 307 Ga. 609, 612 (837 SE2d 833) (2020).

Appellant correctly points out that the jury *could* have found that Lewis was an accomplice, which would have required his testimony to be corroborated by other evidence. See *Fisher v. State*, 299 Ga. 478, 485 (788 SE2d 757) (2016) ("Lewis's admission of his involvement with Appellant in the events before, during, and after the shooting, along with his initial lies to the police at the crime scene, could support a finding that Lewis was an accomplice and not merely present for the crimes as he claimed on the witness stand."). But unlike in Appellant's first trial, where due to his counsel's deficient performance the jury was not charged on the need for corroboration of accomplice testimony, see id. at 485-486, in this trial the jury was given the pattern jury instructions on accomplice corroboration, see Georgia Suggested Pattern Jury Instructions,

Vol. II: Criminal Cases, §§ 1.31.92, 1.31.94 (4th ed. 2020), as well as the pattern instruction on parties to a crime, see id. § 1.42.10. In particular, tracking § 1.31.94, the trial court instructed the jury that "a witness is not an accomplice if the participation by the witness in the criminal enterprise was due to coercion or unknowing. There is no legal requirement of corroboration of a witness whose participation was coerced or unknowing."

The properly charged jury was authorized to credit Lewis's testimony that he had no prior knowledge that Appellant would shoot or kill Cullins and that Lewis drove Appellant away from the shooting out of fear that Appellant might shoot him too. The jury could thus determine that Lewis was *not* an accomplice and that his testimony did not need to be corroborated. See, e.g., *State v. Grier*, __ Ga. __, __ (__ SE2d __) (2020); *Kelly v. State*, 270 Ga. 523, 525 (511 SE2d 169) (1999) ("[B]ased on [the witness's] testimony that he had no knowledge that [the defendant] was planning to murder [the victim] and that he acted in compliance with [the defendant's] orders only because he feared for his own life, the question of whether [the

witness] acted as [the defendant's] accomplice was properly submitted to the jury. . . . Because the jury was authorized to conclude that [the witness] was not an accomplice, corroboration was not required."). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

And even if we assume that the jury did determine that Lewis was an accomplice, there was adequate evidence to corroborate his testimony.

> Although OCGA § 24-14-8 provides that corroboration is required to support a guilty verdict in felony cases where the only witness is an accomplice, only slight evidence of corroboration is required. The necessary corroboration may consist entirely of circumstantial evidence. . . . The evidence need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt. The sufficiency of the corroboration is a matter for the jury to decide.

*Raines v. State*, 304 Ga. 582, 588 (820 SE2d 679) (2018) (citation and punctuation omitted). Terrell's and Madden's physical descriptions

of the shooter, Madden's testimony about his Creole or Cajun accent and use of the term "woahdie," and Appellant's move to Detroit after the shooting and flight when officers tried to arrest him were not much corroboration but did support an inference that Appellant was the man who shot Cullins. This circumstantial evidence might not be sufficient on its own to convict Appellant, but it provided the slight corroboration of Lewis's testimony necessary for the jury to find Appellant guilty. See id. at 588-589; *Johnson v. State*, 288 Ga. 803, 805 (708 SE2d 331) (2011).

(b) Although not enumerated as error, we have reviewed the record and conclude that when viewed in the light most favorable to the verdicts, the evidence presented at Appellant's second trial was also sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Fisher*, 299 Ga. at

482-483.[4]

3. Appellant contends that the trial court erred "by allowing [the lead detective] to testify that David Lewis was not an accomplice to the crime." Appellant points to the following exchange between the prosecutor and the detective during the detective's direct examination:

Q: Okay. Did you have — di[d] you take into consideration the actions in the vehicle when the shooter got into the vehicle and Mr. Lewis driving away as far as determining whether [Lewis] was the get-away driver considering that interaction between the two of them?
A: Yes.
Q: And what conclusion did you come to?
A: Well, I mean, the conclusion that I came to is that he most likely believed that he had no choice. He just witnessed someone being shot and killed.

Appellant objected, asserting that the detective's answer "completely invad[ed] the province of the jury." The trial court overruled the objection.

---

[4] We remind litigants that this Court will end its practice of considering the constitutional sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

Despite our many admonitions to the contrary, see, e.g., *Thornton v. State*, 307 Ga. 121, 127 n.6 (834 SE2d 814) (2019), Appellant relies solely on *Medlock v. State*, 263 Ga. 246, 248 (430 SE2d 754) (1993), a case decided under the old Evidence Code, to argue on appeal that the detective's testimony was inadmissible because it constituted a lay witness's opinion on the "ultimate issue in the case," which Appellant asserts was whether Lewis was Appellant's accomplice. Putting aside that whether Lewis was an accomplice was not actually the ultimate issue in the case, and that the detective did not testify directly on the accomplice issue, this Court has repeatedly held — as the State points out — that the current Evidence Code, specifically OCGA § 24-7-704 (a), "'abolished the prohibition on (lay) opinion testimony concerning the ultimate issue in a case.'" *Mack v. State*, 306 Ga. 607, 609 (832 SE2d 415) (2019) (citation omitted). See also *Thornton*, 307 Ga. at 127-128. The current Evidence Code took effect more than five years before Appellant's second trial. Accordingly, even if the detective's testimony touched on the ultimate issue, OCGA § 24-7-704 (a) "does

not bar the admission of his comments." *Mack*, 306 Ga. at 610. This enumeration of error is meritless.[5]

4. Finally, Appellant contends that his trial counsel provided constitutionally ineffective assistance by failing to object to a comment by the prosecutor during closing argument. Because the comment about which Appellant complains was not objectionable, this enumeration of error also lacks merit.

Prior to Appellant's first trial, his associate Clark told Appellant's previous trial counsel about Clark's claim that Lewis was looking for Cullins and may have had a revolver before the shooting; counsel's failure to subpoena Clark to testify was held to be deficient performance. See *Fisher*, 299 Ga. at 483-485. During the retrial, just before Clark was called to testify, the prosecutor and Appellant's new counsel discussed with the trial court how to avoid any mention of Appellant's previous trial and related proceedings during Clark's testimony. The prosecutor explained: "I'm going to

---

[5] Appellant did not object at trial and does not argue on appeal that the detective's testimony was inadmissible on any other ground, so our holding is limited to the meritless "ultimate issue" claim.

want to ask [Clark] questions — well, you didn't tell anyone about this information. And the technical answer is that he told the [prior] defense attorney, but to go into that I don't know if we're walking some type of fine line." Appellant's counsel suggested: "Why don't we just narrowly say, Clark, you had this information. You didn't go to the police." Clark was then advised to limit his answers to exclude mention of the previous trial and related proceedings.

During cross-examination, Clark testified that after learning that Appellant had been arrested for Cullins's murder, Clark told Appellant's family about seeing Lewis looking for Cullins before the shooting. The prosecutor then asked, "[D]id you alert the police or authorities to this supposed relevant information?" Clark answered, "No, ma'am," explaining that he was afraid of incriminating himself for using and selling drugs. The prosecutor later asked if Clark alerted the police at any time between 2009 and 2018; Clark replied, "It's when I talked to the lawyer." The prosecutor later asked again about Clark's failure to contact the police, to which Clark responded, "The case — I thought it was already over"; the trial court then told

the prosecutor to "move on."

While discussing Clark's testimony in closing argument, the prosecutor said:

> And this event that he just believed was so relevant and so critical and so memorable and remarkable — he didn't tell any law enforcement authority about it, ever. Not in 2010, '11, '12 — never. We are in 2018. [Appellant] is on trial. And yet [Clark] kept that information from law enforcement officers, the only people who could use it and really do something about it. Tell the DA's office or somebody. Tell somebody. Well, I told the family. Okay.

To prevail on his claim of ineffective assistance, Appellant must prove both that the performance of his trial counsel was professionally deficient and that he was prejudiced by the deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). Where a prosecutor's closing argument was "based on permissible inferences and legitimately supported by the facts in evidence," an objection to the argument on the ground that the prosecutor was mischaracterizing the evidence would have been "meritless," and counsel's failure to make such an objection therefore "is not evidence of ineffective assistance." *Mattox*

*v. State*, 308 Ga. 302, 304-305 (840 SE2d 373) (2020) (citation and punctuation omitted).

Appellant focuses in isolation on the prosecutor's comment during closing argument that Clark did not "[t]ell somebody" about seeing Lewis before Cullins's shooting to argue that the prosecutor improperly attacked Clark's credibility, because Clark had in fact told his story to Appellant's previous trial counsel. When read in context, however, it is clear that the prosecutor's point, both during cross-examination and during closing argument, was that Clark did not provide his information to any *law enforcement authority*, and that point was supported by the trial evidence. In addition, Clark said during his testimony that he had told a lawyer about the information before the retrial, the prosecutor's argument acknowledged that Clark had told Appellant's family, and the trial court instructed the jury that "[e]vidence does not include . . . closing remarks of the attorneys." Accordingly, an objection on the ground that Appellant now raises would have been meritless, and trial counsel did not provide constitutionally ineffective assistance by not

making that objection. See *Mattox*, 308 Ga. at 304-305.

*Judgment affirmed. All the Justices concur.*

Decided September 8, 2020.

Murder. Fulton Superior Court. Before Judge Schwall.
*R. Gary Spencer*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, F. McDonald Wakeford, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General,* for appellee.